By the Court: It is so ordered.

Note:—See under (1) 29 Cyc. p. 875.

---

## In re WAH-KON-TAH-HE-UM-PAH'S ESTATE.
### HE-TO-OP-PE et al. v. HANNA et al.

No. 15028—Opinion Filed Dec. 2, 1924.

Rehearing Denied March 10, 1925.

**1. Appeal and Error—Appeal of Probate Case to District Court—Validity of Bond.**

In prosecuting appeal from a judgment of the county court to the district court in probate proceedings, an appeal bond which fails to give the residence of the sureties, and which is made to the opposing party as the obligee instead of to the state of Oklahoma, but is otherwise in conformity with the statutes providing for such appeals, is sufficient to confer jurisdiction upon the district court; and it is within the discretion of the district court to permit the bond to be amended, or permit the filing of a new statutory bond.

**2. Wills—Contests—Review — Conclusiveness of Findings.**

Will contest cases are of purely equitable cognizance. Upon appeal in such cases from the district court to the Supreme Court, it is the duty of the Supreme Court to examine the whole record and weigh the evidence; but the findings and judgment of the district court should not be disturbed because of the insufficiency of the evidence unless it is made to appear that such findings and judgment are against the clear weight of the evidence.

**3. Wills—Probate—Burden of Proof.**

The proponents of a will are required, under the law, to make a prima facie showing that the instrument tendered for probate was executed and attested in the manner provided by statute, by a person possessed of testamentary capacity, acting voluntarily and not under duress or undue influence. In case of a contest on the grounds of lack of formality in the execution and attestation, or lack of testamentary capacity of the testator, or upon the ground that the testator was acting under duress or undue influence in the execution of the instrument, and a prima facie showing has been made by the proponents entitling the will to probate, the burden rests upon the contestants to establish some ground of contest which would destroy the instrument as a will.

**4. Wills—Test of Testamentary Capacity.**

In determining the mental status of a testator in a will contest case, the question to be determined is, Did the testator possess testamentary capacity at the time of making the will? The prior or subsequent mental status has bearing only to the extent of helping to determine the mental status at the time of the execution of the instrument. In re Chandler's Will, 102 Me. 72. 66 Atl. 215; Bilby v. Stewart, 55 Okla. 767, 153 Pac. 1173.

**5. Same—Presumption of Sanity.**

In determining the mental status of a testator, a presumption of sanity will be indulged; and where the will appears to be a rational act performed in a rational manner, such presumption and such apparently rational act amounts to evidence of testamentary capacity. George Weir's Will, 39 Ky. (9 Dana) 434; In re Blackfeather's Estate, 54 Okla. 1, 153 Pac. 839.

**6. Same—Evidence—Reputation as to Sanity.**

In a will contest case, evidence of the general reputation of the testator for being crazy or otherwise is not admissible for the purpose of determining the mental status of the testator at the time of making the will.

(Syllabus by Shackelford, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court. Osage County; Jesse J. Worten, Judge.

Action by He-to-op-pe, Osage allottee No. 864, et al., against Angela Hanna (formerly Angela McKinley) Osage allottee No. 247, et al. Judgment for defendants. Plaintiffs appeal. Affirmed.

Leahy, McDonald & Files and H. P. White, for plaintiffs in error.

Johnson & Johnson and Grinstead & Scott, for defendants in error.

Opinion by SHACKELFORD, C. This case presents a contest over a will. The plaintiffs in error were the contestants, and the defendants in error were the proponents of the will. The parties hereto will be referred to herein as contestants and proponents.

Wah-kon-tah-he-um-pah. Osage Allottee No. 246, on July 22. 1918, executed an instrument denominated "Last Will and Testament of Wah-kon-tah-he-um-pah." She died on the ———day of ————, 1920. Certain of the beneficiaries under the purported will began a proceeding in the county court of Osage county to probate such will. The contestants objected to the will being probated on the grounds of lack of testamentary capacity on the part of the testatrix, duress and undue influence, and that the formalities required by the statute were not complied with in the execution of the will so as to entitle it to probate. A hearing was had and the probate of the will was denied in the county court, and an appeal was prosecuted by the proponents to the district court of Osage county. The case was tried de novo in the district court, and the will ordered admitted to probate. The contestants prosecute appeal to this court. They present their assignments of error under the following propositions:

1. The district court acquired no jurisdiction because the statutory appeal bond was not filed in undertaking to perfect appeal from the county court.

2. The proponents of the will failed in their proof to show that the will was executed, attested and published as required by law; and failed in their proof to show that the testatrix had testamentary capacity on the date of making the purported will.

3. The court erred in admitting incompetent evidence on the part of the proponents; and in excluding competent evidence on the part of the contestants.

The first question for consideration is whether or not the district court acquired jurisdiction to try the cause on appeal from the county court. On the 17th of May, 1922, the county court denied the probate of the will, and fixed the amount of the appeal bond in the sum of $500. Service of notice of appeal was accepted on the 23rd of May, 1922, giving notice that the proponents appealed from the judgment of the county court upon both questions of law and fact. The appeal bond was approved on the 23rd of May, 1922, by the county judge. Section 1415, Comp. Stat. 1921, provides that an appeal bond filed to perfect an appeal from a judgment of the county court must be signed by at least two sufficient sureties;

and section 1419, Comp. Stat. 1921, provides that the bond must contain the name and residence of each of the sureties, and be filed in the county court, and must be made to the state of Oklahoma. The appeal bond filed in this case gives the names of the sureties in the body of the bond, but does not give their places of residence. It runs to the contestants as "He-to-op-pe, et al.," instead of to the "state of Oklahoma." The contestants filed a motion in the district court to dismiss the appeal because the bond was not in the form prescribed by the statute. The proponents of the will were permitted to file an amended bond in the district court, in statutory form.

In Ryndak v. Seawell, 13 Okla. 737, 102 Pac. 125, this court held that a requirement that the clerk shall indorse approval upon the bond was directory only. To the same effect is Leach v. Altus State Bank, 56 Okla. 102, 155 Pac. 875.

In Barnes v. Barnes, 47 Okla. 117, 147 Pac. 504, this court held that:

"The fact that a bond on appeal from the county court to the district court in a probate proceeding is made to the administrator as obligee, instead of the state, as required by section 6510, Rev. Laws 1910 (section 5460, Comp. Laws 1909), does not render said bond void so as to defeat jurisdiction on appeal."

In the case of Barnett v. Blackstone Coal & Mining Company, 60 Okla. 41, 158 Pac. 588, this court held that:

"Notwithstanding section 5460, Comp. Laws 1909 (section 6510, Rev. Laws 1910), requires an appeal bond on appeal from the county court to the district court to be made payable to the state of Oklahoma, an appeal bond otherwise in exact conformity with the statute, but payable to the adverse party, is a valid bond."

In Drainage Dis. No. 5, Oklahoma County, v. Ferrell, 32 Okla. 381, 122 Pac. 698, it was held by this court that upon a motion to dismiss an appeal because an appeal bond in exact conformity with the statute was not given, it was within the discretion of the district court to permit the amendment of the bond or to permit the filing of a new bond, in conformity with the statute. It was also held in that case that a failure to use the statutory words in describing the sureties was not fatal, and did not render the bond illegal and void.

Also we find that one of the proponents was under guardianship and the appeal to the district court was being prosecuted by the guardian. Section 819, Comp. Stat. 1921, provides:

"Who need not give bond on appeal. Executors, administrators and guardians who have given bond in this state, with sureties, according to law, are not required to give an undertaking on appeal or proceeding in error."

We think that while the appeal bond given was not in strict conformity with the statutes, it was sufficient in form and substance to confer jurisdiction on the district court on appeal; and that it was within the discretion of the district court to permit an amendment of the bond to be made to make it conform to the statutes, or permit the filing of a new bond in conformity with the statute. The bond filed in the county court and approved by the county judge was sufficient to confer jurisdiction upon the district court on appeal, and the parties filed in the district court, by the court's permission, a new, statutory bond. The bond being sufficient to confer jurisdiction in the first place, it was not error to permit the filing of a new, statutory bond.

Upon the trial de novo in the district court, the court admitted the will of Wah-kon-tah-he-um-pah to probate. Will contest cases are of purely equitable cognizance in this jurisdiction. Upon appeal in such cases, from the district court, it becomes the duty of the Supreme Court to examine the whole record and weigh the evidence; but the findings and judgment of the trial court will not be disturbed because of insufficiency of the evidence unless it is made to appear that such findings and judgment are against the clear weight of the evidence.

The testatrix was a full-blood Osage Indian, and at the time of making the will in question was about 74 years old. There are two important questions to examine and decide in this contest: First, did the testatrix have testamentary capacity at the time the will is said to have been made? Second, was the instrument offered for probate executed and published in conformity with the law so as to make it a last will and testament and entitle it to probate as a will?

In examining the first question we find that a legal presumption exists that the testatrix was of sound mind and disposing memory; and that such presumption, coupled with an apparently rational act done in an apparently rational manner in making the will, amounts to some evidence that testamentary capacity existed at the time the will was made. George Weir's Will, 9 Dana (Ky.) 434; In re Blackfeather's Estate, 54 Okla. 1, 153 Pac. 839.

In the Blackfeather Case, supra, this court held that:

"A presumption of sanity goes with every one, and the burden of proving unsoundness of mind in a will contest rests upon the contestant."

The evidence tends to show that Angela Hanna McKinley, one of the beneficiaries under the will, is a daughter of a niece of the testatrix, and whose parents died when she was a small child, and she was taken to the home of the testatrix and there lived until she was married. This child seems to have been referred to as a child or grandchild by the testatrix. The other beneficiaries under the will were children of John Blackbird, who was a nephew of the testatrix. It seems that for some considerable time the testatrix lived in the home of John Blackbird, and these children were referred to by her as her children, or her grandchildren. The contestants are collateral kindred of the testatrix and are of nearer kin than the beneficiaries. It seems that the testatrix, through a period of five or six years before she made the will, had talked at different times and to different persons of making a will in substance the same as the one proposed for probate. A few days before making the will on July 22, 1918, she engaged a taxi driver to take her to the Indian Agency on the day she went to make the will, and told him she was going there to make her will. When they started she directed the taxi driver to go by the home of Alfred McKinley and they went there and got Angela McKinley and her husband and took them along, and under her direction they drove by the home of Mary Blackbird and got Maud McKinley, another of the beneficiaries. She was taken to Pawhuska at her own direction, and to the Indian Agency, and there found Mr. Woodward, the attorney for the Osage Agency. The testatrix there gave directions as to how she wanted to dispose of her property, describing it, and the attorney for the agency prepared the will as directed by her. Several days after the will was made she talked with an old Osage acquaintance and told him that she had made a will substantially as was made. It seems that she had in mind the making of this will for several years, when her mental capacity seems to have been unquestioned, and when she must have well known the property she owned, and her kin. There is testimony in the record that shortly before she made the will she was in the hospital being treated for burned feet and dysentery, and at that time seems to have been laboring under a dementia, but was not treated for that. She was discharged from the hospital in a better condition both physically and

mentally, and afterwards made the will. Sometime after she made the will she was returned to the hospital, where she died two or three years afterwards. There seems to be evidence in the record by both expert and nonexpert witnesses to the effect that in their opinions. at the time they observed the testatrix, she would have been incapable of carrying on or transacting the ordinary business affairs of life. None of these witnesses observed her at the time she made the will. It seems that it is not so much a question of the mental condition before or after making the will. The matter to be determined is the mental status at the time of making the will. It was held in the case of In re Chandler's Will (Me.) 66 Atl. 215, a leading case on this subject, that:

"The question for determination is, Was the testator of sound mind at the time the will was executed? If he was, his precedent and subsequent condition is immaterial"

—citing Beach on Wills, and cases from Indiana, California. Oregon, Alabama, and Maryland.

This seems to be the well established, general rule. It also appears that whether or not the testatrix was capable of transacting the ordinary business affairs connected with her estate is not the true test of testamentary capacity. Under our own statutes, a person under guardianship may, notwithstanding the guardianship, make a will, and male persons under age, if over 18 years old, may make a will. A will may be made by such individuals when there is at least no legal presumption of actual capacity to carry on the ordinary business affairs of life. Our own court has laid down the rule by which testamentary capacity is to be determined. In Bilby v. Stewart, 55 Okla. 767, 153 Pac. 1173, this court said:

"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined with precision, where capacity ends and incapacity begins. but this question should be determined from all the facts and circumstances of each particular case.

"Ordinarily the test of testamentary capacity is the testator's capacity to understand the effect and consequences of his act, at the time the will is executed."

In Dickey v. Dickey, 66 Okla. 269, 168 Pac. 1018, this court said:

"When the testator. in making a will, understands the nature and consequences of his acts and is free from duress, menace, fraud, and undue influence, he has testamentary capacity."

In Payton v. Shipley, 80 Okla. 145, 195 Pac. 125, it was said:

"A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom and things in which he has been chiefly interested. He must understand the act which he is doing and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will."

All of the things required by the rules laid down in these cases might well have existed in the mind of this testatrix without her being actually competent to transact the ordinary business affairs connected with her estate. It seems that her estate consisted of approximately a quarter of a million dollars worth of property and money. To have handled it even in a reasonably good business way would perhaps require considerable business ability. But, if she understood in a general way the nature and extent of her property, and her relation to those around her and those who should be in her mind and remembrance as the natural objects of her bounty, and who should be in her mind in making final disposition of her property by will, it seems that under the rules laid down in the cases cited, she would be possessed of testamentary capacity, although she might not have been capable of looking after and taking care of her considerable estate in the ordinary course of business affairs. The evidence tends to show that she understood and knew in a general way the nature and extent of her considerable property, since it is shown that she gave the directions as to the disposition of her property. She seems also to have known her relationship to those around her, and the natural objects of her bounty. It was said in the matter of George Weir's Will, supra, that:

"The best possible proof of a sound and disposing mind is 'a rational act, rationally done', which reason alone could have conceived and accomplished. There is no use for metaphysics then; nor should speculation perplex the judgment when the question is solved by the palpable fact that rational intellect shows itself by acts which can be the offspring of no other than an intelligent, sound, and reasoning mind."

What more natural thing could have been than for this testatrix to want to give her property to children she had lived with and helped to raise, and who knew her as a grandmother and whom she knew as

her children or her grandchildren? They were not nearest of kin to her, but as a matter of natural affection and intimacy of association, these beneficiaries were first in the heart and affections of this old Indian testatrix. In making the will she did the thing she had planned for years, and made a most natural and rational disposition of her property when she should be done with it.

The testimony bearing upon the testamentary capacity of the testatrix is not all one way, but after a careful consideration of all the testimony upon that branch of the case, we conclude that the finding of testamentary capacity made by the trial court is supported by the clear weight of the evidence.

Was the instrument offered for probate executed in a manner which would entitle it to probate as a last will? Section 11231, Comp. Stat. 1921, provides the formalities that shall be observed in making a will, not a noncupative or holographic will.

"First. It must be subscribed at the end thereof by the testator himself, or some person, in his presence and by his direction, must subscribe his name thereto.

"Second. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them, to have been made by him or by his authority.

"Third. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and

"Fourth. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will at the testator's request and in his presence."

The will is in substantial conformity with the statute, and is as follows:

"Office of Indian Affairs.
　"Received Jan 3, 1921.
　　"62885.

"Office of Indian Affairs.
　"Received July 27, 1918.
　　"193.

"Last Will and Testament of Wah-kon-tah-he-um-pah.

"I, Wah-kon-tah-he-um-pah, being of sound and disposing mind, memory and understanding, do hereby make publish and declare this instrument as and for my last will and testament, as follows, to wit:

"1. I direct that all my last sickness and funeral expenses be paid as soon after my death as possible.

"2. I give and devise unto my niece, An-

gela Hanna, Osage Allottee No. 247, in fee to her and her heirs forever, my homestead allotment, described as follows: SW¼ of 22-24-6.

"3. I give and devise unto my niece Maud McKinley, Osage Allottee No. 83 in fee to her and to her heirs forever, my second selection of land described as follows: W½ of SW¼ of 15-24-6 and S: of NE¼ of 16-24-6.

"4. I give and devise unto my nephew, Che-sho-ki-he-kah, Osage Allottee No. 2194, in fee to him and his heirs forever, my third selection of land described as follows: E½ of SE¼ of 28-25-8 and N½ of NW¼ of 34-25-8.

5. I give and devise to my nephew, Ki-he-ah-tah. unallotted child of Mary Blackbird, in fee to him and his heirs forever, my fourth selection of land described as follows: S½ of NW¼ of 34-25-8 and S½ of SE¼ of 1-22-11 and S½ of NE¼ of SE¼ of 1-22-11.

"6. I direct that the land inherited by me from my deceased husband, Moh-hau-a-gra, deceased Osage Allottee No. 245, be sold and the proceeds thereof, together with all the rest, residue and remainder of my estate, real, personal, or mixed and wheresoever situate including any rights of property which have accrued or may accrue to me by virtue of my being a member of the Osage tribe of Indians. I give, devise and——absolutely and in fee unto my nephews and nieces hereinafter mentioned, share and share alike, that is to say:

"Angela Hanna, Osage Allottee No. 247, one-fourth.

"Che-sho-ki-he-kah, Osage Allottee No. 2194, one-fourth.

"Ki-he-ah-tah, unallotted child of Mary Blackbird, one-fourth.

"Maud McKinley, Osage Allottee No. 83. one-fourth.

"In witness whereof I have hereunto set my hand and seal this 22nd day of July, 1918.

"Wah-kon-tah-he-um-pah,
(X) "Her Mark

"Witnesses to mark:

"Fred Penn, who signed the name of testatrix at her request and in her presence. "Paul Albert.

"Signed, sealed, published and declared by the above named testatrix, as and for her last will and testament in our presence and we, at her request, at the same time, and in her presence and in the presence of each other have hereunto subscribed our names as witnesses.

"Fred Penn.
"Paul Albert.

"I hereby certify that I have fully. truly

and correctly interpreted the——going instrument to the said testatrix, and I believe that she fully a——understands the contents thereof.

"Fred P———
                    "Interpreter.
(Corner torn off where dashes appear)

"Probate

"10425-21

"L A P

"Department of the Interior,

"Office of Indian Affairs.

"Sep, 16, 1921.

"The within will of Wah-kon-tah-he-um-pah, deceased Osage allottee No. 246, dated July 22, 1918. is hereby recommended for approval in accordance with the provisions of the Act of April 18, 1912 (37 Stat. L. 86-88) as to all property and estates mentioned or described therein under the jurisdiction of the United States.

                    "Respectfully,
                    "E. B. Merritt
                    "Assistant Commissioner.

"Department of the Interior.

"Office of the Secretary.

"Sep. 19, 1921.

"The within instrument of Wah-kon-tah-he-um-pah, deceased allottee of the Osage tribe of Indians, is hereby approved as to all property and estate devised and bequeathed therein and under the jurisdiction of the United States, in accordance with the provisions of the Act of April 18, 1912 (37 Stat. L. 86-88) and the Regulations of the Department.

                    "F. M. Goodwin,
                    "Assistant Secretary.

"Endorsed: County Court Osage County, Filed Jan. 10. 1922. Thos. Leahy, Court Clerk by E. Grub, Deputy."

The testimony as to the manner of the execution of the will tends to show that the testatrix came to the Osage Agency at Pawhuska for the purpose of making her will. She so advised the attorney for the Agency and he excluded everybody but the testatrix, called in the official interpreter, and with the three of them in the room, through the interpreter the attorney learned from the testatrix what her property consisted of and what disposition she wanted to make of it, and by her direction prepared the instrument as quoted above. After it was prepared the interpreter read it over to testatrix in the Osage language. Paul Albert, another Osage Indian, who speaks both the English and Osage language, was called in. So, there were then present the attorney for the agency, who had prepared the will, the official interpreter, who had interpreted the English and Osage languages

as between the testatrix and the attorney, Paul Albert, an English speaking Osage Indian, and the testatrix herself, and after the will was interpreted to the testatrix she placed her thumb mark upon it and the interpreter wrote her name at the foot of the instrument, and the testatrix told Paul Albert it was her will and that she wanted him to sign it, and he signed both as a witness to her mark and a witness to the attestation clause, and the interpreter also signed both as a witness to the mark and as a witness to the attestation clause. And it seems that Fred Penn, the official interpreter, also signed a statement that the will was correctly interpreted by him to the testatrix, and that he believed she fully understood the contents of it. It seems that the attorney instructed the testatrix through the interpreter as to what was necessary as to the witnessing of the will, and the attorney got the information back through the interpreter that the testatrix requested the interpreter and Paul Albert to sign as witnesses. There seems to have been almost no lack of technical compliance with the statutory requirements as to formalities. The testatrix did not need to tell Fred Penn, the interpreter, that the instrument was her will. Through him as interpreter she had given the details to the attorney and after it was prepared in English he read it over to her in Osage, and she seems to have understood and approved it by putting her thumb mark upon it. She told Paul Albert it was her will and wanted him to sign, and wanted Penn to sign, and they signed the will in her presence and in the presence of each other. The will upon its face shows technical compliance with the statute. The parol evidence taken upon the trial tends to show that there was substantial compliance with the statutory requirements to make a valid will. Absolute technical compliance with the statutory provisions is not necessary to make a valid will. It was so held in Re Williams' Will (Mont.) 145 Pac. 957: Foley's Will, 76 Misc. Rep. 168, 136 N. Y. Supp. 933; Reed v. Watson, 27 Ind. 443. In discussing the declaration as to the will, and the witnessing, etc., the Montana court, in the first case cited, said:

"Such declaration, it is true, need not be in words. Where, for instance, the testator is rational, the will is read to and signed by him in the presence of witnesses, and they, in his presence and with his intelligent acquiescence, are requested by another to attest the same and do so, the requirements of the statute have been sufficiently met."

· The will itself, with the attestation clause

appended, is prima facie proof of due execution. In re Grant's Will (Wis.) 135 N. W. 833; In re Buell's Will, 60 N. Y. Supp. 385; Hart v. Hart et al. (Ill.) 125 N. E. 366; In re Miller's Estate (Mont.) 97 Pac. 935.

There was testimony tending to show that the will as made was the free and voluntary act of the testatrix, and the circumstances under which the will was made, as shown by the evidence, was such as would justify an inference by the court that there was no duress, menace, or undue influence; particularly in the absence of any proof that the will was executed under duress or undue influence. There seems to be no proof in the case tending to show or even create a suspicion that the will was the result of fraud, menace, duress, or undue influence.

The rule seems to be that the proponents of the will take the burden of making a prima facie showing of due execution of the will by one possessed of testamentary capacity, acting voluntarily and not under duress or undue influence. In a will contest case, after the prima facie case is made out by the proponents, the burden of proof then shifts to the contestants to establish the allegations, or some of them set up as grounds of contest. It seems clear, in an examination of the record in this case, that the proponents made a sufficient prima facie showing entitling the will to probate. It is also quite clear that the contestants did not maintain the burden cast upon them to overcome the prima facie case made by the proponents, by the weight of the evidence. The finding and judgment of the trial court appear to be supported by the clear weight of the evidence upon all the grounds of contest.

The contestants complain that the court admitted, over their objection, the introduction in evidence of a copy of an affidavit made by Fred Penn with reference to the due execution of the will. Fred Penn, the official interpreter and a witness to the will, had died before the trial. The congressional act governing the affairs of the Osage Indians provides for the disposition of their property by will; that an Osage Indian will must be approved either before or after the death of the testatrix, by a governmental agency named in the act, to be effective as a will. This agency requires some proof of due execution of the will outside of the will itself. This particular will was approved in the manner provided by the congressional act, upon the affidavit of Fred Penn, one of the attesting witnesses. It is the introduction of a copy of this affidavit as evidence of

which the contestants complain. It readily appears that it was incumbent upon the proponents of the will to show that the will had ben approved as required by the congressional act. It seems that error could not be predicated upon the introduction of what the approval agency had before it in determining whether or not the will should be approved as required by the act of Congress for it to become, as a matter of law, a will. The affidavit was substantially the same as the attesting clause attached to the will. The introduction of the affidavit of Fred Penn was not error. There are some other matters of which complaint was made. We have examined all of them, and find no substantial cause for complaint. No prejudicial error was committed by the court in admitting evidence on behalf of the proponents, requiring a reversal of the judgment.

The contestants complain because the trial court would not permit them to show by one witness that the testatrix was generally known and referred to by her acquaintances as the "old crazy woman." No case is pointed out to us where evidence of the general reputation of being crazy was admitted in the trial of a will contest, as bearing upon testamentary capacity or the lack thereof, of the testator. We know of no such case. In the absence of a case deciding the point, we are inclined to think that evidence of general reputation as to mental capacity or incapacity of a party making a will is not admissible. Even if the court had admitted the proof of general reputation offered, and all of the contestants' witneses had testified that the testatrix had the general reputation of being an old crazy woman, still the court should apply the rules laid down by the cases above cited in determining the testamentary capacity or lack thereof; and if the testatrix should measure up to the rules laid down by this court for determining testamentary capacity, as applied at the time the will was made, the court would be constrained to follow the decided cases rather than evidence of general reputation. We think that evidence of general reputation of mental condition of the testatrix was not admissible for the purpose of determining testamentary capacity or the lack thereof, at the time the will was made. The court did not err in excluding such evidence.

The record supports the judgment of the trial court. We therefore recommend that the judgment be, in all things, affirmed.

By the Court: It is so ordered.